## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-2787

WESTERN SLOPE CONSERVATION CENTER,

THE WILDERNESS SOCIETY, and

WILDERNESS WORKSHOP,

      Petitioners,

vs.

UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the U.S. Department of the Interior,

DAVID BERNHARDT, in his official capacity as the Secretary of the U.S. Department of the Interior, and

JAMIE E. CONNELL, in her official capacity as the Colorado State Director of the U.S. Bureau of Land Management,

      Respondents.

---

## PETITION FOR REVIEW OF AGENCY ACTION

---

## INTRODUCTION

1.      Petitioners Western Slope Conservation Center, The Wilderness Society, and Wilderness Workshop (collectively Conservation Groups) challenge the Bureau of Land Management's (BLM) Final Environmental Impact Statement (EIS) and Record of Decision (ROD) that approved the new Uncompahgre Field Office (UFO) Resource Management Plan (RMP) for nearly a million acres of public lands and mineral estate in western Colorado.

2.      The ROD made available for oil and gas leasing more than 870,000 acres—or 95% of the area managed under the RMP by BLM.  These federal public lands and minerals are dispersed throughout a broader 3.1-million-acre planning area that includes private, state, and other federal lands within Montrose, Gunnison, Ouray, Mesa, Delta, and San Miguel counties. BLM's decision to make almost the entire area managed under the RMP available to oil and gas leasing threatens the area, which is treasured for its scenic beauty, idyllic towns, organic agriculture, recreational opportunities, clean air and water, and abundant wildlife.

3.      Prior to issuing the ROD, the Federal Respondents failed to take a "hard look" at the environmental impacts of opening nearly the entire management area to oil and gas drilling, including within potential Areas of Critical Environmental Concern (ACECs) and Lands with Wilderness Characteristics (LWCs) and near waterways on which local communities and wildlife rely.  The EIS failed to fully disclose how oil and gas development will harm lands and natural resources, along with the values that Congress prescribed for ACECs, LWCs, and other special places.  Instead, the EIS ignored key issues and assumed, without rational support, that vague or unsupported mitigation measures will protect certain values and minimize impacts on resources.  The EIS also failed to evaluate the full scope of climate change issues and greenhouse

gas emissions resulting from oil and gas development under the RMP.  As a result, BLM violated the National Environmental Policy Act (NEPA) and its implementing regulations.

4.      BLM also fell short of its duties under NEPA by failing to consider a meaningful range of alternatives for oil and gas development.  Four of the alternatives that it analyzed would have opened virtually identical amounts of the management area —about 95%—to oil and gas leasing, while the other proposed opening at least two-thirds of the area.  BLM rejected viable alternatives that would have meaningfully reduced oil and gas leasing throughout the management area, where about 25% of the federal mineral estate—nearly 225,000 acres—is already leased for oil and gas development.  BLM's narrow range of alternatives was unreasonable and ignored overwhelming public concern about the impacts of oil and gas development in the planning area as well as the mounting science showing the harmful impacts such development has on communities, conservation, and climate change.

5.      BLM's final decision also rejected many of the limited protections for special lands, waterways, and people that were included in the Draft EIS/RMP's preferred alternative and instead prioritized oil and gas development over all other uses.  This change in direction was unsupported by a rational explanation and ran counter to evidence showing greater conservation protections were warranted.  Further, BLM's final decision was based on factors that Congress did not intend it to consider under the Federal Land Policy and Management Act (FLPMA).  In particular, BLM's failure to prioritize designation of ACECs, refusal to protect *any* LWCs, and its reduction of mitigation for waterways was irrational and defied the facts before the agency.

6.      Due to these and other flaws, the Conservation Groups challenge BLM's EIS, ROD, and RMP as arbitrary, capricious, and contrary to NEPA and FLPMA.  The Court should therefore vacate these decisions under the Administrative Procedure Act (APA).

**JURISDICTION AND VENUE**

7.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the APA, 5 U.S.C. § 701 *et seq*.; NEPA, 42 U.S.C. § 4321 *et seq*.; FLPMA, 43 U.S.C. § 1701 *et seq*.; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.; and the Equal Access to Justice Act, 28 U.S.C. § 2214 *et seq*.  An actual, justiciable controversy now exists between Petitioners and Respondents, and the requested relief is therefore proper under 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 2201–02.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and Conservation Groups are headquartered and/or have offices in this District.

9.      The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

10.      Petitioners have exhausted their administrative remedies.

**PARTIES**

11.      Petitioner WESTERN SLOPE CONSERVATION CENTER (the Conservation Center)[1] is a non-profit organization founded in 1977 that aims to build an active and aware community to protect and enhance the lands, air, water, and wildlife of the lower Gunnison River watershed, approximately 76% of which is federally-owned public land and largely managed by BLM's UFO.  The Conservation Center is located in Paonia, where it focuses on issues affecting Delta County and the North Fork Valley related to three main areas of conservation: public lands planning and advocacy, watershed stewardship, and education and engagement with the

---

[1] The Western Slope Conservation Center is registered as a trade name of NFRIA-WSERC Conservation Center, Inc. with the Colorado Secretary of State.

community.  The Conservation Center has hundreds of members and several full-time staff members in the North Fork Valley and Western Slope of Colorado.

12.     Petitioner THE WILDERNESS SOCIETY (TWS) is a non-profit organization dedicated to protecting wilderness and inspiring Americans to care for our wild places.  TWS is one of America's leading public lands conservation organizations.  Since 1935, TWS has been dedicated to protecting America's wild places for current and future generations, and is committed to smart and sensible regulation and management of public lands and work to ensure that public resources are used effectively, efficiently, and responsibly.  TWS supports a transition to renewable energy, including by ensuring that oil and gas and other energy development is focused in suitable locations  and completed in a manner that does not harm other values.  TWS has offices throughout the country, including an office with more than two dozen employees in Denver, Colorado and another office in Steamboat Springs, Colorado.  TWS has several thousand members in Colorado and over one million members and supporters nationwide.

13.     Petitioner WILDERNESS WORKSHOP (WW) is a non-profit organization dedicated to preservation and conservation of the wilderness and natural resources of western Colorado's public lands, including in the UFO planning area.  WW engages in research, education, legal advocacy, and grassroots organizing to protect the ecological integrity of local landscapes and public lands in the area affected by the RMP.  WW focuses on the monitoring and conservation of air and water quality, wildlife species and habitat, natural communities, and lands of wilderness quality.  WW is the oldest environmental non-profit in the Roaring Fork Valley, dating back to 1967, and now has a membership base of more than 700 people.

14.     Petitioners bring this action on their own behalf and on behalf of their adversely affected members.  Conservation Groups' members, staff, supporters, and volunteers live, work,

recreate, or otherwise use and enjoy the public lands, waters, and natural resources within the UFO planning area that is the subject of this lawsuit.  They regularly visit and use this area for recreational, aesthetic, scientific, educational, spiritual, conservation, commercial, informational and other purposes, and plan to continue doing so in the future.  They have an interest in the protection and enhancement of natural and human communities in the planning area, and have serious concerns about the impact of the Final EIS, UFO RMP, and ROD—which will allow oil and gas development and other activities to harm the resources and values that they treasure.

16.     Conservation Groups participated in the public planning process by submitting detailed comments, meeting with BLM representatives, conducting outreach to their members and supporters about the RMP, and protesting the Final EIS and Proposed RMP in August 2019.

16.     During that process, Conservation Groups were denied information, analyses, data, and explanations about BLM's EIS, decision-making, RMP, and the resulting impacts on their interests in the UFO planning area.  As a result, BLM prevented the Conservation Groups' from fully understanding and responding to threats to the public lands, resources, and communities at issue here; diverted their limited resources to addressing these issues; frustrated their ability to fulfill their missions and goals; and harmed their organizations in other ways.

17.     Respondents' violations of NEPA, FLPMA, the APA, and other laws in adopting the challenged decisions have injured and will continue to injure the recreational, aesthetic, scientific, educational, spiritual, conservation, commercial, informational and other interests of Conservation Groups and their staff, members, and supporters.  These are actual, concrete injuries caused by Respondents' legal violations, for which judicial review and the relief requested is required to redress.  Conservation Groups have no adequate remedy at law.

18.     Respondent BUREAU OF LAND MANAGEMENT is an agency or instrumentality of the United States within the U.S. Department of the Interior, and has been delegated responsibility for managing the public lands and resources governed by the UFO RMP and ROD at issue in this case, in accordance and compliance with federal laws and regulations.

19.     Respondent DAVID BERNHARDT is the Secretary of the U.S. Department of the Interior and is sued solely in his official capacity.  Secretary Bernhardt is the federal official who is ultimately responsible for ensuring that BLM's management of federal public lands, resources, and mineral estates in Colorado complies with all applicable laws and regulations.

20.     Respondent JAMIE E. CONNELL is the Colorado State Director of the U.S. Bureau of Land Management and is sued solely in her official capacity.  State Director Connell is responsible for managing the federal public lands, resources, and mineral estates in Colorado under BLM's jurisdiction and overseeing the Uncompahgre Field Office at issue here.

## LEGAL BACKGROUND

### National Environmental Policy Act (NEPA)

21.     NEPA's twin aims are: (1) to foster informed decision making by requiring agencies to consider the environmental impacts of their proposed actions; and (2) to ensure that agencies inform the public that they considered environmental concerns.  42 U.S.C. § 4331; 40 C.F.R. § 1500.1(b)-(c).[2]  To accomplish these goals, federal agencies must prepare an Environmental Impact Statement (EIS) to consider the effects of each "major Federal action[ ] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C)(i).

---

[2] Recent revisions to NEPA's regulations do not apply to decisions issued before the September 14, 2020 effective date.  85 Fed. Reg. 43304, 43339 (July 16, 2020).  Thus, the complaint cites to the 1978 version of the regulations that was effective when the RMP was issued.

22.     An EIS must take a hard look at the environmental impacts of a proposed action before reaching a decision and "provide full and fair discussion of significant environmental impacts."  40 C.F.R. § 1502.1; 42 U.S.C. § 4332(2)(C).  An EIS must also "[r]igorously explore and objectively evaluate all reasonable alternatives" and explain why other alternatives were eliminated from detailed study.  40 C.F.R. § 1502.14(a); 42 U.S.C. § 4332(2)(C)(iii), (E).

23.     NEPA requires that an EIS analyze the "direct effects, which are caused by the action and occur at the same time and place," as well as "indirect effects, which are . . . later in time or farther removed in distance, but are still reasonably foreseeable" and cumulative impacts, which are those resulting "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  40 C.F.R. §§ 1502.16, 1508.7–1508.8.

24.     To fulfill NEPA's public participation goals, federal agencies must "assess and consider" comments "both individually and collectively" and properly respond to comments in a final EIS.  *Id.* §§ 1502.9(b), 1503.4(a).  If an agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts[,]" an agency must issue a supplemental draft and final EIS.  *Id.* § 1502.9(c).

25.     At the time of its decision, an agency must release a "record of decision" (ROD) that identifies and discusses all factors that the agency balanced when making its decision and state how those considerations entered into its decision.  *Id.* § 1505.2.

**Federal Land Policy and Management Act (FLPMA)**

26.     FLPMA directs BLM to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain

public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).  BLM must also follow multiple use principles, which requires the agency to achieve "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations."  *Id*. §§ 1702(c); 1732(a).

27.     To do so, the agency must develop RMPs that guide future management decisions and then conform all resource management decisions to such plans.  *Id*. § 1712; 43 C.F.R. § 1610.5-3(a).  When developing an RMP, BLM must, *inter alia*, follow multiple use principles; consider physical, biological, economic, and other sciences; consider present and potential uses of the public lands; and weigh long- and short-term benefits to the public.  43 U.S.C. § 1712(c).

28.     Additionally, BLM "shall . . . give priority to the designation and protection of areas of environmental concern" (ACECs), which are areas "where special management attention is required … to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards."  *Id*. §§ 1712(c)(3), 1702(a).

29.     "Areas having potential for [ACEC] designation and protection management shall be identified and considered throughout the [RMP] process."  43 C.F.R. § 1610.7-2(a).  BLM evaluates potential ACECs based on their relevance and importance.  *Id*.  Relevance means "a significant historic, cultural, or scenic value; a fish or wildlife resource or other natural system or process; or natural hazard" is present.  *Id*. § 1610.7-2(a).  Importance means an area has "substantial significance and values."  *Id*.  BLM must consider areas that meet these criteria for designation and if it designated, include "the general management practices and uses, including mitigating measures, identified to protect designated ACEC[s]" in an RMP.  *Id*. § 1610.7-2(b).

30.     Wilderness characteristics are another special resource that BLM must consider during the RMP process.  *See* 43 U.S.C. § 1712(c)(4) (directing BLM to rely on "the inventory of the public lands, their resources, and other values" when revising an RMP); *Id*. § 1782(a) (noting that FLPMA requires BLM to inventory roadless areas with wilderness characteristics); *see* BLM MANUAL: CONSIDERING LANDS WITH WILDERNESS CHARACTERISTICS IN THE BLM LAND USE PLANNING PROCESS (Mar. 15, 2012) at .06 (stating: "[m]anaging the wilderness resource is part of the BLM's multiple use mission" and must be addressed in an RMP).

31.     FLPMA relies on the definition of wilderness characteristics in the Wilderness Act, which explains that lands with wilderness characteristics possess naturalness, outstanding opportunities for solitude or primitive recreation, sufficient size to preserve in an unimpaired condition, and ecological, scenic, or other values.  43 U.S.C. § 1702(i); 16 U.S.C. § 1131(c).

32.     When preparing RMPs, BLM must provide "opportunities to meaningfully participate in and comment on" the plans and must comply with NEPA's requirements when doing so.  43 C.F.R. §§ 1610.2(a), 1601.0-6.

**Administrative Procedure Act (APA)**

33.     The APA governs judicial review of agency actions under NEPA and FLPMA and provides a right to judicial review for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  The APA directs courts to "hold unlawful and set aside agency action . . . found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).  Agency actions should be set aside if made "without observance of procedure required by law."  *Id.* § 706(2)(D).

### STATEMENT OF FACTS

**Threats to Treasured Resources in the Uncompahgre Area**

34.     The UFO RMP covers nearly a million acres in southwest Colorado just south of Grand Junction and within Montrose, Gunnison, Ouray, Mesa, Delta, and San Miguel counties. There, BLM manages 675,800 acres of public lands and administers 971,220 acres of federal mineral estate, nearly 250,000 acres of which is under state, city, and private lands.  The UFO RMP area is interspersed with other lands owned or managed by other entities.  This broader planning area comprises about 3.1 million acres and is depicted in the following map:



Uncompahgre RMP Planning Area

35.     The UFO planning area is treasured for its scenic beauty, recreational opportunities, idyllic communities, organic agriculture, abundant wildlife, and natural resources.

36.     Recreation opportunities abound, drawing locals and visitors for whitewater rafting, mountain biking, horse packing, camping, hiking, backpacking, mule deer and elk hunting, fruit picking, and more.  Recreational uses of public lands in the area are expected to increase over the next twenty years.

37.     Local communities—including the towns of Delta, Montrose, Paonia, Ouray, Norwood, and Telluride—and the surrounding six counties are home to roughly 250,000 people.

38.     An area of particular importance and public interest within the UFO is the North Fork Valley.  Nestled within the North Fork and Smith Fork drainages of the Gunnison River, the North Fork Valley is located in the northern corner of the planning area surrounding Paonia and within Delta and Gunnison counties that includes 63,390 acres of public lands and 159,820 acres of federal mineral estate managed by the UFO.

39.     Organic agriculture is a mainstay and important economic driver of the area— particularly in the North Fork communities, which boast the largest concentration of organic farms in Colorado.  Vineyards, produce farms, and orchards abound, and more than 36,000 acres of BLM-administered land are designated as farmland of statewide importance, unique importance, or prime farmland.  Farming depends on clean water in rivers, streams, and groundwater and in the canals, ditches, and other irrigation facilities that transfer water.

40.     BLM lands in the area provide crucial late summer and early fall habitat for black bears, crucial winter range for deer and elk, and habitat for threatened, endangered, and sensitive species like the Gunnison sage grouse, Canada lynx, yellow-billed cuckoos, and bald eagles.

41.     Many streams and rivers in the area support important trout fisheries, including the Gunnison River, which is a Colorado Gold Medal trout stream.  The Gunnison Basin is also major headwater for the Colorado River System and serves as a "water bank" to ensure adequate flows remain to meet the Colorado River Compact requirements.

42.     Historically, coal and other mining activities helped support the local economy, but such extractive industries are winding down as mines continue to close.  Non-extractive industries that are dependent on protection of natural resources—like agriculture, tourism, recreation, and others—continue to grow and support the local communities.

43.     But the area's natural resources and rural, scenic, and wild character are under increasing pressure from oil and gas interests.  BLM has already issued oil and gas leases for nearly 225,000 acres, or one quarter of the federal mineral estate covered by the UFO RMP.

44.     Expanding oil and gas development in the RMP area threatens the people, wildlife, and crops that rely on the area's clean water and air and healthy landscapes to survive and thrive.  Drilling and operating oil and gas wells irreparably damages the land, scars the visual landscape far beyond, fragments wildlife habitat, impedes recreation or other public land uses, causes harmful air emissions, generates significant noise, increases road construction and use, destroys wilderness characteristics and other important values of special lands, consumes large amounts of surface or groundwater, and produces massive quantities of wastewater and other toxic materials.  Further, oil and gas activities produce large amounts of greenhouse gas emissions that contribute to climate change, which is already harming the planning area.  BLM admits that climate change is projected to further cause earlier snowmelt, reduced precipitation, warmer temperatures, increased drought, and more severe and frequent wildfires.  In turn, climate change will harm countless resources and values like waterways and special lands.

**BLM's RMP Planning Process for the Uncompahgre Area**

45.     In December 2009, BLM began a public process to replace the 1985 San Juan/San Miguel RMP and the 1989 UFO Basin RMP, which governed this remarkable landscape for decades.  BLM informed the public that a new resource management plan was "necessary in order to respond to changing resource conditions, new issues, and federal policies, as well as to prepare a comprehensive framework for managing public lands administered by the UFO."

46.     In 2010, BLM initiated a scoping process and sought public comment on what issues to consider.  Special land designations, such as wilderness and ACEC issues, recreation, and non-renewable energy development were the most common topics raised by the public.

47.     Subsequent controversy arose over proposals for oil and gas leasing in the North Fork Valley, where most of the oil and gas activities on BLM-managed lands have occurred.

48.     In response, local stakeholders and governments spent 18 months crafting a community alternative for the valley, entitled the "North Fork Alternative Plan" to protect the economy, special places, resources, and communities by closing 75% of the valley to oil and gas leasing and imposing no surface occupancy (NSO) stipulations on leasing in many places.

49.     In May 2016, BLM released a Draft RMP/EIS and sought public comment on four alternatives.  Each alternative proposed different goals, objectives, standards, and mitigation measures for a new RMP to govern BLM's decisions in the UFO planning area for two decades.

50.     Alternative A was the "no action" alternative that retained direction from the existing RMPs, which kept 95% of the management area open to oil and gas leasing.

51.     Alternative B provided the greatest conservation protections, and included the North Fork Alternative Plan—as a "sub" alternative B.1—but would still keep a majority of the

management area open to oil and gas leasing, with 76% of the area open under Alternative B and 66% of the area open under Alternative B.1.

52.     Alternative C purported to "maximize utilization of resources" by elevating extractive uses above conservation protections, while Alternative D—BLM's preferred alternative—claimed to emphasize "balancing resources and resource use" among competing interests, land uses, and values.  But both proposed to keep virtually the same amount of the management area open to oil and gas leasing as the status quo: about 95%.

53.     BLM received more than 50,000 public comments that raised a host of concerns about the Draft RMP/EIS, including its emphasis on oil and gas development across all alternatives, inadequate protections for natural resources, and insufficient special designations.

54.     Conservation Groups, other organizations, and individuals called for BLM to evaluate alternatives that included greater protections from oil and gas development, such as ones not allowing any new leasing in the North Fork area or throughout the entire planning area.

55.     Although Conservation Groups urged BLM to consider even greater protections for the North Fork Valley, they supported the community's Alternative B.1 as the best of those evaluated in detail.

56.     Outside of the North Fork Valley—which includes most of the UFO management area and nearly all existing and potential ACECs and LWCs—TWS urged the agency to evaluate an alternative that considered the actual oil and gas "development potential" for specific lands and closing, at a minimum, the more than 400,000 acres with lower development potential.

57.     TWS's proposal explained that closing lands with lower development potential would stop speculative leasing—a pernicious industry practice that locks up lands for the duration of a lease regardless of whether the lands are ever developed.  Once these leases are

issued, BLM relies on their existence to deny more productive uses of these lands, such as future conservation designations or preserving wilderness characteristics.

**BLM's Change of Course and Issuance of the Final EIS and Proposed RMP**

58.     During fall 2018, local and state BLM officials in Colorado finished their work on a final EIS and a proposed RMP, which they presented to BLM's leadership and representatives from Respondent Secretary Bernhardt's office in Washington, D.C.

59.     During that briefing, BLM's leadership informed local and state BLM officials that the final documents missed the mark regarding the administration's priorities, particularly stipulations to protect steep slopes and water resources and protections for ACECs and LWCs, which leadership viewed as incompatible with the administration's energy dominance agenda.

60.     According to Respondent Connell, that briefing "resulted in the need to revise the preferred alternatives and analysis[,]" and subsequent discussions "with BLM leadership resulted in additional changes to align the preferred alternative with administration priorities."

61.     Several months later, in June 2019, BLM issued the Final EIS that introduced a new preferred alternative—Alternative E—that BLM proposed to adopt as the RMP.  BLM did not accept public comment on these documents or Alternative E and instead limited public involvement to formal protests of the final decision.

62.     Alternative E proposed keeping open approximately 95% of the management area to oil and gas leasing and jettisoned some of the few conservation protections that were included in the Draft EIS/RMP's original preferred alternative.  Compared to the preferred alternative in the Draft EIS/RMP, Alternative E proposed eliminating more than 135,000 acres of NSO stipulations; abandoning 21,000 acres of ACEC protections; and rejecting protections for roughly 18,000 acres of LWCs.

63.     BLM rejected Conservation Groups' call for considering and adopting an alternative that meaningfully reduced oil and gas leasing across the management area.

64.     As a result, in the Final EIS, four of the five alternatives proposed to open virtually identical amounts of the management area to oil and gas leasing: about 95% of the management area.  The roughly 5% of the area closed to leasing under these alternatives was closed by statute or otherwise was not subject to BLM's leasing discretion.  In other words, BLM chose to keep open virtually every acre it could in four of the five alternatives.

65.     Alternative B/B.1—the most protective of all—still proposed keeping a majority of the area open to oil and gas leasing, at 75% and 66% respectively.  Indeed, BLM admitted that the "acreage open or closed to fluid mineral leasing … is similar for most alternatives" and that as a result, the cumulative impacts of Alternatives C, D, and E on energy development would be "fairly similar since the amount of land unavailable for oil and gas leasing are comparable (less than a 6,000-acres difference between the three alternatives)."

66.     Further, four alternatives would open a nearly identical proportion of lower development potential lands, about 95%, while Alternative B and B.1 would open about 82% or 70%.  None considered closing all or most of the lower development potential lands.

67.     BLM justified its decision not to use development potential "to allocate closures to fluid minerals" on the grounds that future technologies could change and make areas viable in the future.  But BLM did not otherwise respond to comments that urged the agency to consider or use development potential as a factor in determining oil and gas allocations.

68.     BLM claimed that the "range of alternatives is consistent with the current administration's directives" but did not describe how it used them to craft the alternatives.  Other

than cryptic references to political priorities, BLM did not explain how it developed or why it chose Alternative E as the preferred alternative in the Final EIS/Proposed RMP.

### BLM's Analysis of Special Lands and Resource Impacts Prior to its Final Decision

69.     Throughout the planning process, Conservation Groups, local communities, and others expressed serious concerns about BLM's proposal to keep open approximately 95% of the management area to oil and gas leasing.  Impacts to ACECs, LWCs, water resources, and climate change, in particular, were a key issue of many comments and significant public concern.

*ACECs*

70.     Under the previous RMP, BLM protected five ACECs across 30,000 acres of the UFO: 1) Needle Rock (80 acres); 2) Adobe Badlands (6,370 acres); 3) Fairview South (210 acres); 4) San Miguel River (22,780 acres); and 5) Tabeguache Creek (560 acres).  These ACECs protected a wide range of relevant and important values like scenic qualities, threatened and endangered species habitat, active geological processes, unique plant species, high-quality native riparian communities, and cultural resources.

71.     Early in the planning process, BLM reviewed 20 proposals for new ACECs across more than 215,000 acres: the public proposed 11 and the agency's own specialists nominated 9. BLM found 18 of these potential ACECs, in addition to the existing 5, met FLPMA's relevance and importance criteria and should be considered for designation during the planning process.

72.     Conservation Groups and others urged BLM to protect these areas as ACECs to prevent irreparable damage, which can easily occur from activities like oil and gas development.

73.     In the Draft EIS/RMP, BLM's preferred alternative would designate 51,320 acres as ACECs.  For existing ACECs, BLM proposed to retain Adobe Badlands, Needle Rock, and San Miguel River; expand Fairview South; and remove Tabeguache Creek.

For newly proposed ACECs, BLM proposed to add four: 1) Biological Soil Crust to protect 1,900 acres of cryptogamic crusts that support a higher than normal species diversity and rare lichens; 2) Dolores River Slickrock Canyon to protect 9,780 acres of largely roadless spaces, a spectacular canyon, and sensitive species habitat; 3) Paradox Rock Art to protect 1,080 acres with important rock art and archaeological sites; and 4) Roubideau Corridors to protect 8,720 acres with canyons and streams that have very high biodiversity significance.  The Draft RMP/EIS included measures like no surface leasing stipulations to protect proposed ACECs.

74.     But BLM reversed course in the Final EIS and the new Alternative E, abandoning its original proposal to designate the Dolores River Slickrock Canyon and the Roubideau Corridors and slashing the acreage in the proposed Biological Soil Crust from 1,900 acres to 390 acres and the San Miguel River by 1,120 acres.  As a result, thousands of acres that were originally proposed for protection as ACECs would not receive special management attention like protection from surface impacts of oil and gas leasing.  BLM did not explain in the Final EIS why nearly half of the acres that it originally proposed to protect through ACEC designation were no longer worthy of protection.  The Final EIS did not identify what new facts arose to demonstrate that the important and relevant values throughout those four potential ACECs could be protected without designation.  For the many other proposed ACECs, the Final EIS did not explain how their relevant and important values would be protected without designation, why BLM did not prioritize their protection, or what the resulting impacts would be.

75.     In response to comments that the Draft EIS relied on outdated research and ignored climate change in its ACEC analysis, BLM declined to include updated research and to discuss climate change in this analysis *at all*.  Thus, the Final EIS did not address how BLM will protect relevant and important values as the impacts of climate change increase in the future.

*Lands with Wilderness Characteristics*

76.     Lands with wilderness characteristics (LWCs) are those areas with sufficient size, a high degree of naturalness, and outstanding opportunities for solitude or primitive recreation. By managing LWCs to protect these values, BLM can benefit other resources and values like fish and wildlife, cultural resources, and clean air and water.

77.     During the planning process, BLM assessed 105,310 acres outside of designated wilderness or wilderness study areas (WSA) and found that 42,150 acres in the following seven areas possessed wilderness characteristics: Adobe Badlands WSA Addition, Camel Back WSA Adjacent, Dolores River Canyon WSA Adjacent, Dry Creek Basin, Lower Tabeguache/Campbell Creek, Roc Creek, and Shavano Creek.

78.     Conservation Groups urged BLM to protect all LWCs from activities that are generally incompatible with preservation of wilderness characteristics such as oil and gas development, which scars and fragments the land, increases road construction and use, produces industrial noise and pollution, and interferes with quiet and primitive recreation.

79.     In the Draft EIS/RMP, BLM's proposed alternative was to *protect* the wilderness characteristics in 18,320 acres, or less than half of the overall LWC acreage.  But in the Final EIS and Proposed RMP, BLM reversed course and decided not to protect *any* LWCs.

80.     The Final EIS admitted that the Proposed RMP would "prioritize other multiple uses" over wilderness characteristics, even though BLM admitted elsewhere that not managing "for the explicit protection of the inventoried [LWCs] would leave these lands vulnerable to surface-disturbing activities, which would likely diminish wilderness characteristics over time." But BLM did not explain why it chose to elevate other uses over LWC protection or how that choice satisfied the agency's obligations under FLPMA and NEPA.

81.     At the same time, BLM announced a new vague criterion for managing the 18,320 acres of LWCs that were previously slated for protection under the Draft EIS/RMP: BLM would "minimize" impacts on those areas.  But the Proposed RMP admitted minimization of impacts would be discretionary and only occur "when possible," would still allow "competing resource uses" to occur, and did not address how or when BLM will decide to minimize impacts.

82.     Nevertheless, the Final EIS assumed that the Proposed RMP and its minimization criterion "would provide more protection" for areas that BLM inventoried as LWCs compared to the status quo.  But the Final EIS did not explain how this was so, given that the Proposed RMP would actually weaken some measures in the existing RMP for some of the inventoried LWCs.

83.     For most of the LWCs that would not be subject to the minimization criteria under the Proposed RMP (23,830 acres out of 42,150 acres total), the Final EIS provided little discussion of impacts to wilderness characteristics even though most of those acres would be open to oil and gas leasing without protection from surface disturbance.

84.     Moreover, the Final EIS overlooked the short-and long-term benefits of protecting LWCs and did not even mention climate change in its analysis—let alone evaluate how climate change may affect LWCs when combined with BLM's proposal not to protect *any* LWCs.

*Water Resources*

85.     Water resources in the UFO planning area include the Gunnison, San Miguel, Dolores, and Uncompahgre rivers, a total of more than 2,700 stream miles, shallow aquifers, irrigation conveyances, and dozens of public water systems that support local communities.

86.     The Final EIS admitted that the most widespread water quality impairment in the area is excessive selenium, which can harm wildlife through reproductive failure and deformities in fish and aquatic birds.  This problem—which is a particular threat in the Gunnison Basin—

stems from the prevalence of Mancos soils, which have high selenium concentrations and are highly erodible and thus susceptible to running off into waterways.

87.     High salinity is another water quality issue tied to erosion of and runoff from Mancos soils.  The Final EIS admitted that the Gunnison Basin is "the largest nonpoint source of salinity in the Upper Colorado River Basin" and that the agency must, under the Colorado River Basin Salinity Control Act, 43 U.S.C. § 1593, minimize salt contributions from its lands.

88.     The Final EIS admitted that erosion of Mancos soils can occur from just traveling on highly erodible or saline soils and that steep slopes exacerbate the highly erodible nature of the soils, with slopes greater than 40% "prone to accelerated erosion and require additional protection to ensure that site productivity is protected and surface runoff is minimized."

89.     To address these and other problems, in the Draft EIS/RMP, BLM's preferred alternative proposed to close thousands of acres to oil and gas leasing to protect public water supplies, to impose NSO stipulations on more than 139,000 acres with steep slopes greater than 40%, and to provide some protections for major rivers, streams, riparian areas, and wetlands.   In response, Conservation Groups and agencies like the Environmental Protection Act (EPA) urged BLM in comments to adopt even stronger measures to protect water resources.

90.     But in the Final EIS and Proposed RMP, BLM reversed course, without explanation or an adequate response to these comments, abandoning or rejecting some protective stipulations and opting for weaker stipulations, many of which are vague and discretionary and do not ensure sensitive soils and water resources will be protected.  Neither the Draft EIS/RMP nor the Final EIS examined or disclosed the full scope of impacts that would result from BLM's adoption of weaker stipulations, and assumed without support that BLM would impose them and thereby reduce impacts on soils and water resources.

91.     The Final EIS also included little information about how or where oil and gas development under the Proposed RMP, especially on steep slopes, would exacerbate existing problems and trends with soil erosion and resulting selenium and salinity loading.

92.     The Final EIS provided similarly sparse information about other impacts to water resources, particularly related to oil or wastewater spills, groundwater quality, and water quantity, even though Conservation Groups and others expressed serious concern about the impacts of the Proposed RMP on water quantity in the area from oil and gas development, which would consume enormous amounts of water from nearby rivers, streams, or aquifers.

93.     The Final EIS admitted that oil and gas development can cause serious and long-term impacts to groundwater and downstream users and that "[t]he number of acres open for leasing is proportional to the potential for long-term direct health and safety impacts" related to water resources.  Nevertheless, BLM did not explain why it chose to keep 95% of the UFO area open for leasing and to rely so heavily on discretionary stipulations to minimize impacts.

94.     Further, BLM declined to quantify the direct, indirect, and cumulative impacts of water withdrawals expected from oil and gas development.  BLM did not estimate the withdrawals that would occur throughout the *entire* life of the RMP nor did it estimate the likely differences in withdrawals between alternatives.  BLM should have had the information it needed—its estimate of potential oil and gas wells under each alternative and the amount of water typically used per well—but declined to provide these estimates to the public.

95.     Finally, the Final EIS admitted: "[c]ompeting uses for water in an ever drier climate may result in decreases in water quantity and quality in the Planning Area over the long term."  Despite such admissions about the negative impacts expected from climate change, the Final EIS did not evaluate how each alternative would exacerbate such problems.

*Climate Change*

96.     The Final EIS admitted that climate change is occurring and is expected to cause decreased snowpack and precipitation, more frequent droughts, increased wildfires, reduced vegetation, and other problems within the UFO planning area.  Conservation Groups and others informed BLM that these and other impacts have already begun to harm the resources and values and local communities in the UFO planning area, and urged the agency to consider this issue in depth and take action to reduce the agency's contribution to this serious problem.

97.     Instead, the Final EIS claimed that it could not fully or accurately assess the RMP's contribution to climate change given its global scope.  BLM focused on market conditions as a driver of greenhouse gas emissions in the UFO area without fully disclosing that the agency, through oil and gas allocations and mitigation measures in the RMP, could cap or reduce the agency's contribution to greenhouse gas emissions.  BLM also brushed over the costs and problems that would result from keeping 95% of the management area open to oil and gas leasing, despite cataloging the economic benefits from oil and gas development in the Final EIS.

98.     Further, the Final EIS estimated the direct air emissions expected from each alternative and disclosed that Alternative E would release nearly 3 million tons of greenhouse gases each year, which represents an increase from the baseline by approximately 27%.  But for indirect emissions—which account for the downstream combustion of oil and gas—BLM included an incredibly broad range of emissions—between 8 and 129 million tons over thirty years under "high" and "low" development scenarios.  However, BLM did not disclose differences in such emissions for each alternative or show that was not possible.  Further, these estimates were based on outdated data and reports and did not fully consider oil and gas development through the entire life of the RMP, which should be in place until at least 2040.

99.     Despite these estimates, the Final EIS did not assess the full scope of cumulative emissions expected under each alternative and never explained what such quantities of emissions might mean for climate change in general or for particular resources in the planning area.  As a result, BLM did not fully respond to substantial public concern about the RMP's contributions to climate change and what that will mean for the resources and communities in the planning area.

**BLM's Response to Community Uproar and Issuance of the Record of Decision**

100.    Many organizations, businesses, local communities, elected officials, and individuals publicly opposed the Final EIS and Proposed RMP.  During August 2019, Conservation Groups, the Colorado Department of Natural Resources, several counties, the Town of Paonia, Colorado House Representative Julie McCluskie, and others filed protests of the Proposed RMP, raising a wide range of concerns.  Many protests focused on oil and gas issues; impacts on wildlife, water resources, soil stability, climate, and communities; inadequate mitigation; inconsistencies with state and local laws; and the limited range of alternatives.

101.    In their protest, Conservation Groups alerted BLM to this Court's recent decision in *Wilderness Workshop v. BLM*, 342 F. Supp. 3d 1145 (D. Colo. 2018), which held that BLM violated NEPA when it revised another nearby RMP because the agency's range of alternatives for oil and gas leasing was too narrow and the agency failed to evaluate an alternative that closed lower development potential lands.

102.    Many individuals, including the Mayor of Telluride, submitted comments on the Proposed RMP and EIS, which BLM dismissed because they were not raised in protest format.

103.    In September 2019, Colorado Governor Jared Polis invoked the Governor's Consistency Review process under 43 C.F.R. § 1610.3-2, and he informed BLM of inconsistencies between the Proposed RMP and state law and provided recommendations for

addressing concerns about greenhouse gas emissions and protections for wildlife.  In January 2020, BLM rejected most of Governor Polis's recommendations; and in February 2020, BLM denied all of the protests submitted.

104.    In response to Conservation Groups' alternatives arguments, BLM did not provide any additional rationale for its decision not to use development potential as a factor for deciding which lands should be open or closed to oil and gas leasing.  Notably, BLM failed to explain why this position was reasonable in light of this Court's ruling that the agency's very similar position in *Wilderness Workshop* was not reasonable and thus violated NEPA.

105.    On April 2, 2020, Respondent Connell signed a ROD adopting the Proposed RMP with minimal changes, which made the RMP effective immediately.  One week later, BLM announced the ROD was signed in the Federal Register, 85 Fed. Reg. 20296 (April 10, 2020).

106.    The ROD included only a single page describing the "management considerations and decision rationale" and claimed the RMP "provides the best combination of management decisions to meet the purpose of and need for the RMP in consideration of the planning issues and management concerns identified through the planning process."

107.    But neither the ROD nor the Final EIS explained how BLM's "best option" to fulfill the agency's "multiple use" mandate was opening 95% of the area to oil and gas leasing, elevating *all* other uses over protection of any LWCs, rejecting protections for the majority of potential ACEC acreage, refusing reasonable restrictions on activities to protect steep slopes and water resources, and releasing millions of tons of greenhouse gases each year.

108.    In so doing, BLM prioritized extractive uses of public lands over short- and long-term benefits to all other uses and values despite widespread public concern about the harmful impacts of the new UFO RMP that will govern management of these lands for decades to come.

### FIRST CLAIM FOR RELIEF
**Violations of NEPA and APA**
**(Failure to Take a Hard Look at Impacts to ACECs, LWCs, Water Resources, Climate Change, and Local Communities)**

109.    Petitioners reallege and incorporate by reference all preceding paragraphs.

110.    This first claim for relief challenges BLM's violations of NEPA and its implementing regulations, which require BLM to examine and disclose the direct, indirect, and cumulative impacts of its proposed actions and respond to public comments.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.15, 1502.16, 1502.24, 1503.4, 1508.7, 1508.8.

111.    When preparing an EIS during the RMP planning process, BLM must evaluate potential impacts to resources and values like ACECs and inventoried LWCs and analyze other factors such as the relative scarcity of values and the long- and short-term benefits of its decision.  43 U.S.C. §§ 1711(a), 1712(c), 1782(a); 43 C.F.R. §§ 1601.0-6, 1610.4-6.

112.    The Final EIS violated these requirements and failed to take a hard look at the impacts of oil and gas development and other uses allowed under the UFO RMP, by, *inter alia*:

    a.    Failing to establish an accurate baseline of existing conditions across the UFO, including for ACECs, LWCs, water resources, and climate change;

    b.    Failing to fully examine and disclose all direct, indirect, and cumulative impacts of the RMP along with other past, present, and future actions, including: 1) the harm to potential ACECs and LWCs along with the potential short- and long-term benefits of protecting those special places; 2) the harm to water resources from development on steep slopes and from water withdrawals, spills, and wastewater due to oil and gas development; 3) how the RMP will exacerbate the increasing impacts of climate change on resources and values; and 4) the full scope of greenhouse gas emissions expected from oil and gas development;

c.   Failing to fully examine and disclose how BLM will protect the relevant and important values of potential ACECs without ACEC designation and conserve the wilderness characteristics in LWCs without protection under the RMP;

d.   Relying on vague, unenforceable, and voluntary mitigation measures—like BLM's decision to "minimize" impacts to a small subset of LWCs—to reduce threats and impacts to important resources and values without examining or disclosing the effectiveness of the measures or their likely impacts; and

e.   Ignoring mounting scientific evidence that prioritizing oil and gas development threatens human and natural communities and will prevent conservation uses of public lands from conferring greater short- and long-term benefits.

113.   BLM thus fell short of its duty to ensure the public had high-quality and scientifically-sound information about the RMP's impacts before the decision was made.

114.   Further, neither the Final EIS nor the ROD rationally explained how BLM weighed impacts to ACECs, LWCs, water resources, climate change, and communities or balanced other factors it must consider under FLPMA when jettisoning proposed protections and instead adopting Alternative E as the RMP.  BLM also failed to provide adequate and rational responses to all public comments about the impacts of the RMP on key resources and values.

115.   Accordingly, BLM's UFO Final EIS, RMP, and ROD are arbitrary, capricious, an abuse of discretion, not in accordance with NEPA and the APA, and therefore must be reversed and set aside under the APA, 5 U.S.C. § 706(2)(A), (D).  These challenged actions have caused or threaten serious prejudice and injury to the rights and interests of Conservation Groups and their members and staff.

WHEREFORE, Conservation Groups pray for relief as set forth below.

**SECOND CLAIM FOR RELIEF**
Violations of FLPMA and APA
**(Failure to Give Priority to Designating and Protecting ACECs)**

116.    Petitioners reallege and incorporate by reference the preceding paragraphs.

117.    This second claim for relief challenges BLM's violations of FLMPA and its implementing regulations, which require the agency to "give priority" to designating and protecting ACECs by considering if special management attention is needed to protect areas with relevant and important values.  43 U.S.C. §§ 1712(c)(3), 1702(a); 43 C.F.R. § 1610.7-2.

118.    BLM fell short of these obligations by deciding that it need not give priority to protecting most of the 215,000 acres of potential ACECs that it determined possess relevant and important values.  In so doing, BLM failed to provide a rational explanation or adequate factual support in the Final EIS and RMP for its decision to: 1) reject protections for more than 185,000 acres of potential ACECs; 2) protect only about 30,000 acres of potential ACECs; and 3) reverse course from the Draft EIS/RMP by declining designations for 9,780 acres of the Dolores River Slickrock Canyon and 8,720 acres of the Roubideau Corridors and slashing acreage in the proposed Biological Soil Crust from 1,900 acres to 390 acres and the San Miguel River by 1,120 acres.  In particular, BLM failed to demonstrate that the relevant and important values in potential ACECs will be protected without ACEC designation.

119.    In reaching this decision, BLM relied on factors that Congress did not intend it to consider and did not follow its own guidance for designating ACECs.

120.    As a result, BLM did not demonstrate, through a rational explanation or adequate support, that it gave priority to designating and protecting areas with relevant and important values that warranted special management attention as ACECs.

121.    Accordingly, BLM's Final EIS, RMP, and ROD are arbitrary, capricious, an abuse of discretion, not in accordance with FLPMA and the APA, and therefore must be reversed and set aside under the APA, 5 U.S.C. § 706(2)(A), (D).  These challenged actions have caused or threaten serious prejudice and injury to the rights and interests of Conservation Groups and their members and staff.

WHEREFORE, Conservation Groups pray for relief as set forth below.

### THIRD CLAIM FOR RELIEF
**Violations of NEPA and APA**
**(Failure to Consider a Reasonable Range of Alternatives)**

122.    Petitioners reallege and incorporate by reference all preceding paragraphs.

123.    This third claim for relief challenges BLM's violations of NEPA, which requires BLM to develop and explore reasonable alternatives to a proposed action that would avoid or minimize environmental impacts or enhance the quality of the human environment.  42 U.S.C. § 4332(2)(C)(iii), (2)(E); 40 C.F.R. §§ 1502.1, 1502.14.

124.    NEPA also requires BLM to respond to comments and to issue a ROD that identifies and discusses all factors "which were balanced by the agency in making its decision and state how those considerations entered into its decision."  40 C.F.R. § 1505.2, 1503.4.

125.    BLM violated these duties under NEPA by failing to analyze a reasonable range of alternatives for oil and gas development.  Instead, BLM only considered alternatives that would open at least two-thirds of the UFO area to oil and gas leasing, with four of those alternatives keeping open approximately the same amount—95%.

126.    BLM rejected requests from the Conservation Groups and others to study in detail other reasonable alternatives that would have meaningfully limited oil and gas leasing, including one that would close—at a minimum—lands with lower development potential outside of the

North Fork Valley.  In so doing, BLM provided inadequate information about its reasons for rejecting such an alternative, neglected to fully respond to comments, and did not supply a rational explanation for its range of and choice between alternatives in the ROD or Final EIS.

127.   BLM's failure to consider a reasonable range of alternatives in the Final EIS violated NEPA and its implementing regulations, and was arbitrary, capricious, an abuse of discretion, and contrary to law, and therefore must be reversed and set aside under the APA, 5 U.S.C. § 706(2)(A), (D).  The challenged actions have caused or threaten serious prejudice and injury to the rights and interests of Conservation Groups and their members and staff.

128.   WHEREFORE, Conservation Groups pray for relief as set forth below.

**FOURTH CLAIM FOR RELIEF**
**Violations of FLPMA, NEPA, APA**
**(Inadequate Public Disclosure and Participation)**

129.   Petitioners reallege and incorporate by reference the preceding paragraphs.

130.   This fourth claim for relief challenges BLM's violations of FLPMA and its implementing regulations, which require the agency to provide for meaningful public participation in public lands management decisions, including RMPs, 43 U.S.C. §§ 1712(a), 1739(e); 43 C.F.R. § 1610.2(a), and BLM's violations of NEPA and its implementing regulations, which further require BLM to prepare a supplemental EIS and allow for public comment where it "makes substantial changes in the proposed action that are relevant to environmental concerns."  42 U.S.C. §§ 4331(a), 4332(2)(C); 40 C.F.R. §§ 1502.9(c), 1506.6(a).

131.   BLM violated FLPMA and NEPA by introducing and proposing to adopt a new alternative, Alternative E, in the Final EIS and Proposed RMP, that was substantially different than the preferred alternative in the Draft EIS/RMP.  More specifically, Alternative E eliminated numerous measures that were proposed in the Draft EIS/RMP's preferred alternative to protect

various public resources and values, including the following: no surface occupancy stipulations for oil and gas leasing on 134,680 acres; designation of more than 20,000 acres as ACECs; protections for 18,320 acres of LWCs; establishment of 177,700 acres of ecological emphasis areas; and creation of visual resource management areas across 7,850 acres.  These and other changes—including the introduction of complex and qualitative stipulations and management measures that were not evaluated in the Draft EIS/RMP—did not represent a reasonable combination of existing elements.  Instead, Alternative E's likely impacts and environmental concerns were not within the range of those disclosed in the Draft EIS/RMP for public comment.

132.    Given that public comments on the Draft EIS/RMP overwhelmingly called for an alternative and RMP that provided greater, not lesser, protections from oil and gas development, the public could not fairly anticipate that the agency would present a new preferred alternative that elevated oil and gas development over other land uses, resources, and values.

133.    Further, during and after the public comment period, significant new information—including research about climate change and other impacts of oil and gas development on natural resources and communities—arose that demonstrated the effects of Alternative E would be even more severe than previously disclosed in the Draft EIS/RMP. Given this significant new information, BLM should have prepared and circulated a supplemental EIS prior to proposing and adopting the RMP through the ROD.

134.    Accordingly, BLM's Final EIS, RMP, and ROD are arbitrary, capricious, an abuse of discretion, not in accordance with FLPMA, NEPA, and the APA, and therefore must be reversed and set aside under the APA, 5 U.S.C. § 706(2)(A), (D).  These challenged actions have caused or threaten serious prejudice and injury to the rights and interests of Conservation Groups and their members and staff.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request that the Court grant the following relief:

A.      Order, adjudge, and declare BLM violated NEPA, FLPMA, the agency's implementing regulations and policies, and/or the APA in approving the UFO RMP and ROD and accompanying Final EIS;

B.      Reverse, set aside, hold unlawful, and/or vacate the UFO RMP and ROD and accompanying Final EIS;

C.      Enter such other declaratory and/or preliminary or permanent injunctive relief as Conservation Groups may specifically request hereafter;

D.      Award Conservation Groups their reasonable costs, litigation expenses, and attorney's fees associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. §§ 2412 et seq., and/or all other applicable authorities; and/or

E.      Grant such further relief as the Court deems necessary or appropriate in order to remedy Respondents' violations of law, vindicate the interests of Conservation Groups and the public, and preserve and protect the public lands and resources at issue.

Dated: September 15, 2020.

Respectfully submitted,

s/ Elizabeth H. Potter
Elizabeth H. Potter (OR Bar No. 105482)
Todd Tucci (ID Bar No. 6526)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(206) 342-7024
epotter@advocateswest.org
ttucci@advocateswest.org

*Attorneys for Conservation Groups*

s/ Peter Hart
Peter Hart (CO Bar No. 37832)
WILDERNESS WORKSHOP
P.O. Box 1442
Carbondale, CO 81623
(970) 963-3977
peter@wildernessworkshop.org

*Attorney for Wilderness Workshop*